## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

ALONZO HAMPTON                                              PLAINTIFF
ADC #137559

V.                           No. 5:19CV00184-DPM-JTR

JESSICA MICKELS, Correction Officer,
Cummins Unit ADC, *et al.*                                  DEFENDANTS


## RECOMMENDED DISPOSITION

The following Recommended Disposition has been sent to Chief United States District Judge D.P. Marshall Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not file objections, Judge Marshall may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.


## I. Introduction

Plaintiff Alonzo Hampton ("Hampton") filed this *pro se* § 1983 action alleging that, while he was a prisoner at the Cummins Unit of the Arkansas Division

of Correction ("ADC"), Defendants Correctional Officer Jessica Mickels ("Mickels"), Warden William Straughn ("Straughn"), Deputy Warden Christopher Budnik ("Budnik"), and ADC Director Wendy Kelley ("Kelley") violated his Eighth Amendment rights by failing to take the necessary steps to protect him. According to Hampton, this led to him being attacked by inmate Antonerio Norris ("Norris") on August 14, 2018. *Doc. 2.*

In support of his failure to protect claims, Hampton alleges that, beginning in October 2017, he informed Straughn, Budnik, and Kelley that a "criminal prison gang" called the Gangster Disciples had "put a bounty on his head." In response to that vague warning, Hampton states that they did not take it seriously, refused to transfer him to another unit, and failed to train their officers properly and ensure they were following all applicable prison policies. As a result, Hampton claims they are responsible for him being attacked by Norris. *Id. at 4-5.* Finally, shortly before and during the attack, Hampton alleges: (1) Mickels allowed Norris to push open an unlocked "cage door" during yard call, and then attack Hampton, who was handcuffed and unable to defend himself; (2) Mickels failed to intervene or call for help; and (3) Mickels kicked Hampton in the back, called him a racial epithet, and

told him to "get up" after the attack. *Id. at 4.* Hampton sues all Defendants in their individual capacities and seeks monetary damages. *Id. at 5.*[1]

Defendant Kelley has filed a Motion for Summary Judgment on the issue of exhaustion, a Brief in Support, a Statement of Undisputed Material Facts, and a Reply. She argues she is entitled to judgment, as a matter of law, because Hampton failed to exhaust his available administrative remedies regarding his claims against her.[2] *Docs. 27-29, 36.* Hampton has filed a Response, a Brief in Support, and a Statement of Disputed Facts. *Docs. 31-34.*

Hampton has filed a Motion for Summary Judgment on the merits of his failure to protect claims, a Brief in Support, a Statement of Undisputed Material Facts, and a Declaration. *Docs. 49-52.* Defendants have filed a Response, a Brief, and a Response to Hampton's Statement of Facts. *Docs. 61-63.*

Finally, all Defendants have filed a Cross Motion for Summary Judgment on the merits of Hampton's claims, a Brief in Support, and a Statement of Undisputed

---

[1] On July 2, 2019, the Court dismissed Hampton's equal protection claim and all claims against Defendants in their official capacities. *Docs. 4, 6.*

[2] In support of her argument, Kelley has submitted: (1) a Declaration, dated September 26, 2019, from Shirley Love, the ADC's Inmate Grievance Coordinator (*Doc. 27, Ex. A);* (2) a copy of ADC Administrative Directive 14-16 (*id., Ex. B)*); and (3) grievance documents for CU-18-00479 and CU-18-00480 (*id., Exs. C & D).*

Material Facts.[3] *Docs. 58-60.* Hampton has filed a Response and a Brief in Support.[4]

*Docs. 69-70.*

Thus, the issues are joined and all Motions for Summary Judgment are ready

for disposition.[5]

---

[3]In support of their arguments, Defendants have submitted: (1) the transcript of Hampton's February 10, 2020 deposition (*Doc. 58, Ex. A)*; (2) CU-17-01373 grievance documents (*id., Ex. B*); (3) Straughn's Declaration (*id., Ex. C*); (4) Budnik's Declaration dated March 26, 2020 (*id., Ex. D); (5) Mickels's Declaration dated March 25, 2020 (*id., Ex. E*); (6) August 14, 2018 Incident Report (*id., Ex. F*); (7) photos of Hampton taken on August 14, 2018 (*id., Ex. G*); (8) Hampton's Enemy Alert Notification dated August 14, 2018 (*id., Ex. H*); (9) November 14, 2017 and January 16, 2018 Memoranda from Budnik to Straughn (*id., Ex. I*); (10) ADC Administrative Directive 13-49, Enemy Alert System (*id. Ex. J); and* (11) video of the August 14, 2018 incident (*Sealed Doc. 26).*

[4]In addition to Defendants' exhibits and his own sworn Declaration (*Doc. 52*), Hampton relies on the following documents: (1) September 22, 2017 disciplinary report (*Doc. 51 at 5-7);* (2) October 31, 2017 Memorandum from Crystal Wood (*id. at 11*); (3) November 2, 2017 Memorandum from Budnik (*id. at 12*); (4) November 16, 2017 Memorandum from Kelley's office (*id. at 13*); (5) January 12, 2018 Memorandum from Kelley's office (*id. at 15*); (6) August 14, 2018 medical record (*id. at 16*); (7) CU-18-00901 grievance documents (*id. at 17, 19-21*); (8) September 14, 2018 Memorandum from Kelley's office (*id. at 18*); (9) grievance documents for CU-18-00941 (*id. at 22*); and (10) Defendants' Responses to Interrogatories (*id. at 23-25).*

[5]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).

## II. Facts

1.     From August 3, 2017, to December 27, 2018, Hampton was incarcerated in the Cummins Unit. *Docs. 60 & 70 ¶ 4.*[6]

2.     At all times relevant to this lawsuit, Straughn was the Cummins Unit Warden; Budnick was a Deputy Warden; Mickels was a Correctional Officer II; and Kelley was the ADC Director. *Docs. 60 & 70 ¶ 5.*

3.     From August 3, 2017 to September 22, 2017, Hampton was a general population prisoner in Barracks 10A. *Docs. 60 & 70 ¶ 7.*

4.     According to Hampton's deposition testimony, five members of a gang known as the Gangster Disciples were also housed in Barracks 10A. *Doc. 58, Ex. A at 16.*

5.     Hampton testified that he had been friends with an inmate named James Walker, who had recently been killed by another inmate. According to Hampton, Walker had access to cell phones. Because he had been friends with Walker, the five gang members thought he knew where Walker kept his cell phones. In September of 2017, the five gang members approached him in the barracks and said they would stab him if he did not tell them where Walker kept the cell phones. *Doc. 58, Ex. A at 15-20.*

---

[6]Defendants' Statement of Undisputed Material Facts regarding the merits of Hampton's claims (*Doc. 60*) contains 96 numbered paragraphs; Hampton's responses to each paragraph appear at pages 10-36 of *Doc. 70.*

6.    On September 22, 2017, Hampton went to non-party Lieutenant Keisler and said: "I need to be lock[ed] up, I know too much and they [are] after me." When Keisler asked who was "after him," Hampton said he would rather be locked up than identify them. Keisler checked Hampton's enemy alert list and saw that he had no listed enemies in Barracks 10A. He ordered Hampton to return to his assigned barracks, and Hampton refused. Hampton was then escorted to restrictive housing. *Doc. 58, Ex. A at 16-17; Doc. 51 at 5-7; Doc. 52 ¶ 5.*

7.    *After September 22, 2017, Hampton was housed in either restrictive housing or administrative segregation for the remainder of his time at Cummins. He was always housed in either a single-man cell, or in a two-man cell by himself. Docs. 60 & 70  ¶¶ 21 & 92.* All of these precautions were implemented in direct response to Hampton revealing that some of his fellow inmates in Barracks 10A, who he refused to identify by name, were threatening to harm him.

8.    Shortly after September 22, 2017, Hampton learned that a "high-ranking" member of the Gangster Disciples had "put four grams of … the drug K2, out for anybody that could assault" him. *Doc. 58, Ex. A at 21.*

9.    On October 18, 2017, Hampton filed an informal resolution (later designated Grievance CU-17-01373), which stated:

> I, Alonzo Hampton, who is a member of the Nation of Gods and Earths am constantly being put in jeopardy at the Cummins Unit prison. I was almost stabbed in population in 10A barracks about some cell phones, now the Gangsta Disciples have put a bounty of 4 grams of K2 on my

head payable to anyone that harms me because I escaped the initial organized attack. The officials at Cummins Unit aren't taking this threat to my life serious. One prisoner has already been killed at this unit within the past three weeks by someone that wasn't on his enemy alert list (i.e., James Walker) therefore they have no idea who will attack me in order to collect this bounty. By me being a member of the Nations of Gods and Earths with an STG file and countless assaults on different inmates who have their own gang ties I cannot in good conscience be housed with another prisoner at Cummins Unit. Within the last month there have been at least seven fights between cellmates one where a prisoner was left blind in one eye therefore these housing arrangements are far from safe especially to someone that has 4 grams of K2 on their head as in my case. It's the ADC employees job to keep me safe but they aren't taking this threat serious and this behavior is jeopardizing my safety. I cannot be housed with any prisoner that is a Christian, a Muslim, Aryan Nation, a member of the Bloods, Pirus, MS-13, Gangsta Disciple, Black Gangsta Disciple, any Hoover Crips, Gangsta Crips, East Coast Crips, Wolf Street Crips, or Neighborhood Crips, also any prisoner that's Irish mafia, Italian mafia, or Russian mafia.The threat to my life is serious and should not be handled in a joking manner by the Cummins prison officials nor should I be threaten by them either.

*Doc. 58, Ex. B at 1.*

10.    On October 25, 2017, Straughn denied Grievance CU-17-01373 for the following reason: "[B]efore any inmates are placed in a cell together, enemy alert lists are checked for both inmates to ensure they may be housed together. Inmates are not allowed to pick and choose their cell nor their cellmate." *Doc. 58, Ex. B at 3.* On October 30, 2017, Hampton appealed Straughn's decision:

The reason I disagree with this response is because my life is in danger at Cummins Unit due to the fact that the Gangsta Disciple Nation, which has over 230 members at Cummins, have a bounty on my head in the amount of 4 grams of K2 payable to anyone that inflicts harm on me. The enemy alert system is not plausible in this situation. One prisoner has already been killed at this unit … by someone who was not

on his enemy alert list and several others have been attack some gravely by prisoners and cellmates not on their enemy alert list. There have been at least 12 of those attacks with the last month and a half. I am advising the ADC administration of a situation they are not aware of with hope that they will respond accordingly to ensure my safety. With that stated, once again I stress my safety and my life is at risk at Cummins Unit. …

*Id. at 3-4.*

11.     On October 30, 2017, Hampton submitted a request for transfer to the ADC's Delta Regional Unit. On November 2, 2017, Budnik denied that request: "Transfers are based on the needs of various institutions, custody levels, vacant beds, security issues, and completion of your initial 60-day assignment." *Docs. 60 & 70 ¶¶ 61-62; Doc. 58, Ex. D ¶¶ 8-9; Doc. 51 at 12.*

12.     In his Declaration dated March 26, 2020, Budnik explained that wardens and deputy wardens do not have the power to unilaterally transfer an inmate from one unit to another, and that the wardens of both the sending and receiving units must agree. According to Budnik, ADC Director Kelley was the only person "with the power and authority" to order Hampton's transfer. *Doc. 58, Ex. D ¶¶ 10-11.*

13.     In early November 2017, Hampton sent a letter to Kelley stating that he wanted to be transferred to another unit because he had run afoul of the Gangster Disciples and was in fear for his life at the Cummins Unit.  Kelley's office forwarded the letter to Budnik and Straughn. *Docs. 60 & 70 ¶ 65; Doc. 58, Ex. I at 1; Doc. 51 at 13.*

8

14.     On November 14, 2017, after investigating Hampton's allegations, Budnik wrote a memorandum to Straughn stating that: (a) Hampton had been in restrictive housing at Cummins since September 22, 2017, based on his allegation that "he was in danger and … knew too much"; (b) he had a history of being in isolation throughout his time in the ADC; (c) he had recently called his family and asked them to put pressure on the ADC to get him transferred to the Delta Regional Unit; (d) the ADC "has gangs everywhere" and Hampton had provided "no evidence" that he was in danger or that any gang member would have issues with him; and (e) Hampton appeared to be "attempting to manipulate" the ADC into transferring him. *Doc. 60 ¶¶ 59, 66-69; Doc. 58, Ex. D ¶¶ 5, 12-13, & Ex. I at 1.*

15.     On November 22, 2017, an ADC Deputy Director responded to Hampton's Step Three appeal of Grievance CU-17-01373, concurring with Warden Straughn's decision: "I suggest that you provide the staff an enemy alert list so they can better match you with a cellmate. Again, inmates are not allowed to pick and choose their cellmates. I find no merit to your appeal." *Doc. 58, Ex. B at 5.*

16.     In January 2018, Kelley's office forwarded to Budnik and Straughn a second letter from Hampton. In the letter, Hampton told Kelley he was going on a hunger strike to protest not being taken seriously concerning his allegations of being threatened by the Gangster Disciples. *Docs. 60 & 70 ¶ 70; Doc. 58, Ex. D ¶ 14, & Ex. I at 2; Doc. 51 at 15.*

17.     On January 16, 2018, after investigating Hampton's allegations, Budnik wrote a Memorandum to Straughn, stating that: (a) "a few inmates," including Hampton, had gone on a hunger strike, which had ended after a "short time period"; (b) he had previously investigated Hampton's "allegations concerning his issue with Gangster Disciples" and being "in danger," and found them to be unsupported by any details or evidence; and (c) Hampton had not provided any evidence to support his claims, and appeared to be attempting to manipulate the system. *Doc. 60 ¶¶ 71-72; Doc. 58, Ex. D ¶ 14, & Ex. I at 2.*

18.     In his Declaration, Budnik explained that, in investigating Hampton's allegations, he was unable to substantiate a viable threat because Hampton just said "people were out to get him" and never provided him or his officers with any names. *Doc. 58, Ex. D ¶¶ 15, 20.*

19.     The ADC has an Enemy Alert Policy, Administrative Directive 13-49 ("AD 13-49"), which is designed to identify those inmates who are known enemies so that appropriate security precautions can be taken. Under AD 13-49, when a staff member becomes aware of threats by or between two or more inmates, an Enemy Alert Notification form is completed and forwarded to the Chief of Security. The form must include a specific reason for the enemy alert. If the enemy alert is warranted, records personnel will enter the enemy alert in each inmate's computer file. *Docs. 60 & 70 ¶¶ 79-81; Doc. 58, Ex. J.*

20.    Hampton could have availed himself of the ADC's enemy alert system by providing prison officials with information identifying particular prisoners who he believed posed a threat to him. *Doc. 60 ¶ 82; Doc. 58, Ex. D ¶ 19.* However, even though he refused to identify the members of Gangster Disciples who initially threatened him, Hampton's claims of being threatened were taken seriously and, on and after September 22, 2017, he was housed in either restrictive housing or administrative segregation, *i.e., either in a single-man cell or a two-man cell by himself. Docs. 60 & 70 ¶¶ 21 & 92.*

21.    Prior to the August 14, 2018 attack by Norris: (a) Hampton never requested that *any particular inmate* be placed on his enemy alert list, or that he be separated from *any particular inmate*; and (b) Hampton never provided Defendants with the name of *any particular inmate* that he believed was threatening him. *Docs. 60 & 70 ¶¶ 73, 83.*

22.    On August 14, 2018, Hampton was in "Yard Pen 8" for recreational yard call, and Inmate Norris was in "Yard Pen 7" next to him.[7] Defendant Mickels was escorting inmates from yard call back into the unit. *Doc. 58, Ex. E ¶¶ 5, 7, & Ex. F.*

---

[7]During recreational yard call, the inmates are placed inside individual cages made of chain-link fencing. *Docs. 60 & 70 ¶ 23.*

23.     Because Mickels and Inmate Norris had a history of "past problems," she elected not to walk Norris back into the unit. Instead, she walked past Norris and went to Hampton's pen to escort him back inside. *Doc. 58, Ex. E ¶ 8, & Ex. F.* Although Hampton states that Mickels and Norris "exchanged words" as she walked past his pen, it is not clear from the video, which lacks any audio. *Video at 6:20:18-6:20:21.*

24.     When Mickels arrives at Hampton's pen, Hampton backs up to the gate and allows her to cuff his hands behind his back. Mickels then opens the gate, removes Hampton from the pen, and begins escorting him back to the unit. *Video at 6:20:24-6:20:36.*

25.     As they approach Norris's pen, he suddenly pushes open the gate, runs out, and begins hitting the handcuffed Hampton in the stomach and face. Mickels does not intervene or try to stop Norris. *Video at 6:20:37-6:20:39.*   In her Declaration and Incident Report, Mickels says she ordered Norris to stop. In his deposition, Hampton testified she gave no such order. *Doc. 58, Ex. E ¶ 11, & Ex. F; Doc. 58, Ex. A at 42; Doc. 70 ¶ 27.* Importantly, Norris's attack on Hampton *lasted less than four seconds.  Video at 6:20:39 to :42.*

26.     As Norris begins his attack, another officer can be seen heading toward Norris and Hampton. *Video at 6:20:40-6:20:41.* According to Mickels, she did not

attempt to intervene to stop Norris because she feared he would attack her due to their past problems. *Doc. 58, Ex. E ¶ 11.*

27.    Perhaps seeing the approaching guard, Norris suddenly stops hitting Hampton, reaches down and picks up a towel, returns to his pen, and closes the gate. *Video at 6:20:42-45.*

28.    When non-party Officer Taraja Grossley arrives, he locks the gate to Norris's pen. As he does so, Mickels walks over to where Hampton is lying on the ground. Standing a few inches from him, she bends over and touches his arm. She then takes out her radio and appears to call for assistance. *Video at 6:20:46-6:21:15.*

29.    Hampton testified that, while he was lying on the ground, Mickels kicked him twice in the side and said, "N----, get up." *Doc. 58, Ex. A at 32, 38.* Mickels states that she did not kick him. *Doc. 58, Ex. E ¶ 16.* The video does not show her kicking him or making any quick movement toward him with her feet. *Video at 6:20:52-6:24:10.*

30.    After additional officers arrive, Mickels steps over Hampton and leaves the area. Another guard helps Hampton stand up, and they walk away. Hampton is walking independently with no limp and no visible injuries. *Video at 6:24:11-6:25:07.*

31.    Hampton was taken to the infirmary for medical attention. Medical staff reported that Hampton had "no major injuries." Hampton claims his eye and knee

were "busted open," his shoulder was cut open from the fence, and his side hurt where Norris had hit him. He was issued a three-day medical script to have his minor cuts and abrasions cleaned and dressed. *Doc. 51 at 16; Doc. 58, Ex. A at 40-41, & Ex. F.*

32.    After his medical examination, Hampton was returned to his single-man cell in restrictive housing. *Docs. 60 & 70 ¶ 31.*

33.    Photos were taken of both Hampton and Norris. Norris was issued a disciplinary for assaulting Hampton. *Docs. 60 & 70 ¶ 32; Doc. 58, Ex. C ¶ 19, & Exs. F & G.*

34.    After the incident, the enemy alert lists for Hampton and Norris were checked, and neither inmate was on the other's list. Because of the incident, Hampton and Norris were placed on each other's enemy alert list. *Docs. 60 & 70 ¶ 33; Doc. 58, Ex. C ¶ 20, & Exs. F & H.*

35.    At his deposition, Hampton testified that he and Norris were at the Varner Unit together in 2009-2010. At that time, they would traffic and trade things like cigarettes. Following an incident where Norris did not pay Hampton what he was owed, Hampton had no further dealings with Norris. Hampton testified that, due to their prior dealings, he "tried to avoid" Norris, but had never filed a grievance about him. Hampton also testified that Norris was a member of the Gangster

Disciples, but had never made any threats toward him, and he had no reason to put Norris on his enemy alert list. *Docs. 60 & 70 ¶¶ 41-44; Doc. 58, Ex. A at 34-37.*

36.    Hampton testified that, when he saw Norris was in the yard pen next to him on August 14, 2018, it "never crossed his mind" to say anything to Mickels about him. He never told Mickels that the Gangster Disciples had a hit out on him, or that Norris was a Black Gangster Disciple. *Docs. 60 & 70 ¶¶ 45-46; Doc. 58, Ex. A at 37-38, 44.*

37.    Before August 14, 2018, Mickels was not aware of any problems between Hampton and Norris and had no reason to believe that Norris would assault Hampton. *Docs. 60 & 70 ¶ 50; Doc. 58, Ex. E ¶ 17.*

38.    Before August 14, 2018, Straughn and Budnick were not aware of any problems between Hampton and Norris and had no reason to believe that Norris would assault Hampton. *Docs. 60 & 70 ¶¶ 84-85, 88-89; Doc. 58, Ex. C ¶¶ 27-28, & Ex. D ¶¶ 21-22.*

39.    On August 23, 2018, Hampton initiated Grievance CU-18-00901, complaining that Mickels failed to protect him and "did nothing [during the less than four seconds] while [he] was getting beat up." *Doc. 51 at 17, 19-21.* On September 20, 2018, Straughn responded:

> Please be advised, this incident has been reviewed. You were taken to the Unit infirmary where you were assessed and treated by medical staff. However, you had no major injuries. Enemy Alert List[s] were checked for you and the other inmate. You were then placed back into

your cell. Corrective action has been taken to ensure this incident does
not happen in the future. I find your complaint has been resolved.

*Id. at 18.*   Hampton appealed and, on October 8, 2018, an ADC Deputy Director

"concur[red] with the warden's decision," considered the matter "resolved" at the

unit level, and found "no merit" to the appeal. *Id. at 21.*

40.   On December 27, 2018, Hampton was transferred from the Cummins

Unit to the Maximum Security Unit. *Docs. 60 & 70 ¶ 93.* According to Hampton,

Defendant Kelley "made the [Maximum Security Unit] take [him.]" *Doc. 58, Ex. A

at 52.*

### III. Discussion

### A.    Kelley's Motion for Summary Judgment Based on Hampton's Failure to Exhaust His Claims Against Her

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust all

available administrative remedies *before* filing a § 1983 action: "No action shall be

brought with respect to prison conditions under section 1983 of this title, or any other

Federal law, by a prisoner confined in any jail, prison, or other correctional facility

until such administrative remedies as are available are exhausted." 42 U.S.C. §

1997e(a). The purposes of the exhaustion requirement include "allowing a prison to

address complaints about the program it administers before being subjected to suit,

reducing litigation to the extent complaints are satisfactorily resolved, and

improving litigation that does occur by leading to the preparation of a useful record."

*Jones v. Bock,* 549 U.S. 199, 219 (2007). In *Woodford v. Ngo*, 548 U.S. 81, 85 (2006), the Court held that the PLRA's exhaustion requirement is "mandatory." *See also Muhammad v. Mayfield,* 933 F.3d 993, 1000 (8th Cir. 2019).

The PLRA requires inmates to: (1) *fully and properly* exhaust their available administrative remedies *as to each claim* that is later raised in a § 1983 action; and (2) complete the exhaustion process *before* initiating the § 1983 action. *Jones,* 549 U.S. at 211, 219-20, 223-24; *Woodford,*, 548 U.S. at 93-95; *Burns v. Eaton,* 752 F.3d 1136, 1141-42 (8th Cir. 2014). Importantly, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218; *see also Woodford*, 548 U.S. at 90 (explaining that administrative exhaustion "means using all steps that the agency holds out, and doing so properly so that the agency addresses the issues on the merits"). Thus, to satisfy the PLRA, a prisoner must comply with the exhaustion requirements of the incarcerating facility before he can properly file a § 1983 action.

The ADC provides a three-step administrative grievance process. ADC Adm. Dir. 14-16 §§ IV(E)-(G) ("AD 14-16") (*Doc. 27, Ex. B).* "If no one responds at Steps One and Two – or if the responses at those steps are dissatisfactory – an inmate may appeal to the level of ADC's 'Chief Deputy/Deputy/Assistant Director' at Step Three." *Muhammad*, 933 F.3d at 997-98.

The ADC administrative grievance policy requires that, in connection with each claim, a prisoner must "*specifically name each individual involved*," and include a "brief statement that is specific as to the substance of the issue or complaint to include the date, place [and] *personnel involved* or witnesses." AD 14-16 §§ IV(C)(4) & (E)(2) (emphasis added). The grievance forms themselves contain these instructions to ensure prisoners are aware of them. AD 14-16, Att. 1 ("[B]e specific as to the complaint, date and place, name of personnel involved and how you were affected."). Finally, the ADC's policy cautions prisoners that, if they "fail to name all parties during the grievance process … their lawsuit or claim [may be] dismissed by the court … for failure to exhaust against all parties." AD 14-16 § IV(C)(4).

Defendant Kelley argues that, because Hampton did not *specifically name her* in a fully exhausted grievance relevant to the failure to protect claims he is now asserting against her, he failed to exhaust his administrative remedies.

In his Complaint, Hampton alleges only that *he wrote letters to Kelley* informing her that his life was in danger. He goes on to allege that, after receiving those letters, Kelley: (1) failed to take his warnings seriously; (2) failed to transfer him to another unit; and (3) failed to make sure that Cummins Unit officers were properly trained and following all policies necessary to ensure that his safety was not jeopardized. *Doc. 2 at 4-5.*

According to Shirley Lowe, the ADC's Inmate Grievance Coordinator, Hampton filed only two grievances, during the relevant time period, which named or made reference to Kelley: CU-18-00479 and CU-18-00480. *Doc. 27, Ex. A ¶¶ 27-28.*[8] In CU-18-00479, Hampton alleged that Kelley was discriminating against him by enforcing rules violations by him and other prisoners, but not ADC staff. *Id., Ex. C.* In CU-18-00480, Hampton complained that Cummins Unit officials were violating ADC policy by using their positions to engage in intimate personal relationships with their subordinates. He asserted that Kelley was at fault because she allowed the supervisors to engage in intimate relationships with their subordinates. *Id., Ex. D.*

Hampton *admits* that neither CU-18-00479 nor CU-18-00480 are relevant to his claims against Kelley in this lawsuit. *Doc. 33 ¶¶ 30, 33.* Instead, he contends that, in Grievance CU-17-01373, he was referring to Kelley when he used the words "ADC employees" and "ADC administration." *Docs. 31-32.* Although Hampton admits that AD 14-16 requires inmates to *specifically name* each individual involved, he argues the grievance policy's "naming requirement" is broad enough to allow prisoners to name individuals by their rank, birth name, job title, office or

---

[8]An incomplete Exhibit A appears at *Doc. 27-1;* a complete, corrected Exhibit A appears at *Doc. 27-5.*

otherwise. Under his strained and unreasonable construction of AD 14-16, he contends that he sufficiently "named" Kelley in two places in CU-17-01373.

In Hampton's Step One informal resolution, he states only that: "It's *the ADC employees* job to keep me safe but they aren't taking this threat serious and this behavior is jeopardizing my safety." *Doc. 58, Ex. B at 1* (emphasis added). Reading this statement in context with the rest of his narrative, it is clear that Hampton is referring to *Cummins Unit officials* as the "ADC employees" who were failing to keep him safe. For example, he goes on to make it clear it is "the *officials at Cummins Unit* [who] aren't taking this threat to my life serious"; one prisoner had already "been killed *at this unit*" and "*they* have no idea who will attack me to in order to collect this bounty"; he "cannot in good conscience be housed with another prisoner *at Cummins Unit*"; and the "threat to my life is serious and should not be handled in a joking manner *by the Cummins prison officials.*" *Id.* (emphases added). Thus, nothing in Hampton's Step One informal resolution put the ADC on notice that the "ADC employees" he was referring to included ADC Director Kelley.

Hampton also contends that Kelley was the person he was referring to in his Step Three appeal, when he stated: "I am advising *the ADC administration* of a situation they are not aware of with hope that they will respond accordingly to ensure my safety." *Id. at 3.* While Kelley is certainly a member of "ADC administration," so are dozens of other ADC employees. Thus, only a "guess and a prayer" might

allow someone to divine that Hampton was using "the ADC administration" as his "catch-all name" for Kelley.

Apart from this argument being nonsense, his only stray reference to "the ADC administration" is contained in his Step Three appeal of CU-17-01373, which he filed on October 30, 2017, *ten months before he was attacked on August 14, 2018.* Hampton admits that, as of October 30, 2017, *he had not yet written any letters to Kelley or otherwise made her "aware" that he believed he was in danger at the Cummins Unit.*[9] Thus, Hampton cannot rely on CU-17-01373 to put the ADC on notice that it needed to investigate Kelley for actions or inactions that had not yet occurred.

Hampton failed to file and fully exhaust *any grievance* that named or otherwise identified Kelley and related to the conduct that supports the failure to protect claims he is now asserting against her in this action. *See Jones,* 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought to court."); *Townsend v. Murphy*, 898 F.3d 780, 784 (8th Cir. 2018) (ADC prisoner failed to exhaust administrative remedies with respect to officials that were not named or otherwise described in his

---

[9]In his motion papers, Hampton refers to exhibits that confirm he first contacted Kelley's office in mid-November 2017, then again in January 2018 and September 2018. *See Doc. 32 at 7, 9, 10; Doc. 33 ¶ 35; Doc. 51 at 13, 15, 18; Doc. 58, Ex. I.* It is undisputed that, *after* he wrote Kelley and she allegedly failed to take adequate steps to ensure his safety, he did *not* file any additional grievances about her conduct.

grievance); *Burns*, 752 F.3d at 1137 (clarifying that a prisoner must exhaust his specific claims against each separate defendant).

Accordingly, Hampton's failure to protect claims against Kelley should be dismissed, without prejudice.

**B.    Hampton's Motion for Summary Judgment on His Failure to Protect Claims Against All Defendants and Defendants' Cross Motion for Summary Judgment**

Hampton argues that he is entitled to summary judgment on his failure to protect claims against all Defendants. In support of his position, Hampton makes two conclusory arguments: (1) despite being "forewarned," Defendants Straughn and Budnik failed to protect him from "clear and foreseeable danger," which resulted in him being attacked by Inmate Norris on August 14, 2018; and (2) Defendant Mickels failed to protect him by creating the unsafe conditions that allowed Norris the opportunity to attack Hampton and then she failed to intervene during Norris's attack. *Docs. 49 & 50.*

In their Cross Motion for Summary Judgment, Defendants argue they are entitled to qualified immunity on all of Hampton's failure to protect claims because: (1) their alleged failure to follow ADC policy does not rise to the level of a constitutional violation; (2) Hampton did not have a constitutional right to a transfer to another prison; and (3) Norris launched a *surprise attack* on Hampton, which makes it impossible for any of the Defendants to have acted with "deliberate

indifference" to a substantial risk that Norris might attack Hampton and cause him serious harm.

"'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal citations omitted). Determining whether qualified immunity applies involves two inquiries: (1) whether the plaintiff's allegations make out the violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the alleged unlawful acts. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "To overcome qualified immunity, a plaintiff must be able to prove that 'every reasonable official would have understood that what he is doing violates' a constitutional right . . . and that the constitutional question was 'beyond debate.'" *Story v. Foote*, 782 F.3d 968, 970 (8th Cir. 2015).

Thus, to establish that Defendants are *not* entitled to qualified immunity, Hampton must demonstrate that: (1) the undisputed facts, viewed in the light most favorable to him, show that *each Defendant* violated his constitutional rights; and (2) the constitutional rights in question were clearly established at the time they were allegedly violated. *See Ashcroft v. Al–Kidd*, 563 U.S. 731, 735 (2011); *Church v. Anderson,* 898 F.3d 830, 832 (8th Cir. 2018).

23

1.    **Hampton's Claims that Mickels, Straughn and Budnik Failed to Follow ADC Policy Do Not Rise to the Level of a Constitutional Violation**

Hampton argues that Mickels failed to follow ADC policy by not ensuring that Norris's pen was locked; she came alone to escort Hampton even though inmates in restrictive housing are supposed to be escorted by two officers; and she failed to call her supervisor when she "exchanged words" with Norris and minutes later when she saw him attack Hampton. *Docs. 60 & 70 ¶¶ 47-48; Doc. 58, Ex. A at 42-45.* Hampton also argues that Straughn and Budnik failed to follow ADC "procedure" in the way they responded to his warning about threats to his safety that he made *many months before the surprise attack by Norris. Docs. 60 & 70, ¶ 57.*

It is well settled that prisoners do not have a constitutional right to enforce compliance with internal prison rules or regulations. *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("there is no federal constitutional liberty interest in having … prison officials follow prison regulations"); *Gardner v. Howard,* 109 F.3d 427, 430 (8th Cir.1997) ("there is no § 1983 liability for violating prison policy").

Thus, as a matter of law, Defendants' alleged failure to follow ADC policy and procedures does not provide a sufficient basis for Hampton to claim that they violated his constitutional rights.

2.    **Hampton's Claims that Straughn and Budnik Failed to Transfer Him to Another Unit Do Not Rise to the Level of a Constitutional Violation**

Hampton asserts a failure to transfer claim against Straughn and Budnik because they did not authorize an "emergency transfer" for him prior to the August 14, 2018 attack. *See Docs. 60 & 70, ¶¶ 52, 56, 58.*

It is well settled that a prisoner does not have a constitutional right to be held in the prison of his choosing. *Olim v. Wakinekona*, 461 U.S. 238, 245-48 (1983) ("Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a state, he has no justifiable expectation that he will be incarcerated in a particular state."); *Meachum v. Fano,* 427 U.S. 215, 224 (1976) (holding that no due process protections were required upon the discretionary transfer of sate prisoners to a substantially less agreeable prison, even where that transfer visited a grievous loss" upon the inmate); *Rouse v. Benson*, 193 F.3d 936, 940 (8th Cir. 1999); *Felker v. Long*, 982 F.2d 525, *1 (8th Cir. 1993) (unpub.) (holding that "just as [a prisoner] has no constitutional right to *avoid* transfer, he has no such right to *obtain* transfer") (emphasis in the original).

The undisputed facts establish that Hampton's vague claims to Straughn and Budnik that unidentified prisoners posed a threat to his safety *were taken seriously* and resulted in him being placed in cells *alone* from the time he brought those threats to their attention on September 22, 2017, until the surprise attack on August 14,

2018. While Hampton specifically requested to be transferred to the Delta Regional Unit, he did not have a constitutional right to be transferred there or to any other ADC unit.

Accordingly, as a matter of law, Hampton's failure to transfer claims against Straughn and Budnik do not rise to the level of a constitutional violation.

### 3.    Hampton's Eighth Amendment Failure to Protect Claims

The Eighth Amendment "requires prison officials to 'take reasonable measures to guarantee' inmate safety by protecting them from attacks by other prisoners." *Patterson v. Kelley,* 902 F.3d 845, 851 (8th Cir. 2018) (quoting *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)). However, while prisoners like Hampton have a clearly established constitutional right to be protected from attacks by other prisoners, this does *not* mean prison officials commit a constitutional violation every time one prisoner attacks another. *Patterson,* 902 F.3d at 851. Rather, to defeat qualified immunity and proceed to trial on a failure to protect claim, a prisoner must present evidence that: (1) objectively, he faced a substantial risk of serious harm from the prisoner who attacked him; and (2) subjectively, *each* defendant was "deliberately indifferent" to that risk. *Id.* An official is deliberately indifferent only if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837.

Deliberate indifference "includes something more than negligence, but less than actual intent to harm: it requires proof of a reckless disregard of the known risk." *Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011); *see Patterson,* 902 F.3d at 852 (guard's absence or inattentiveness during attack "represents – at most – gross negligence, which falls short of deliberate indifference as a matter of law"); *Tucker v. Evans,* 276 F.3d 999, 1001-02 (8th Cir. 2002) (guard's conduct "certainly points to negligence, and quite possibly even gross negligence, but that is insufficient to prove a violation of [an inmate's] constitutional rights"). Because "constructive knowledge, or the 'should-have-known' standard, is not sufficient to support a finding of deliberate indifference," a prisoner must show that prison officials "had been exposed to information concerning the risk [of harm] and thus 'must have known' about it." *Blair v. Bowersox,* 929 F.3d 981, 987 (8th Cir. 2019) (citations omitted).

The Eighth Circuit has repeatedly recognized that qualified immunity shields prison officials from an Eighth Amendment failure to protect claim that arises from the prisoner being the victim of a "surprise attack" by another inmate. *Vandevender v. Sass,* ___ F.3d ___, 2020 WL 4374977, *2 (8th Cir. July 31, 2020); *Patterson,* 902 F.3d at 851-52; *Schoelch v. Mitchell,* 625 F.3d 1041, 1047-48 (8th Cir. 2010);

*Tucker,* 276 F.3d at 1001-02; *Curry v. Crist,* 226 F.3d 974, 978 (8th Cir. 2000);
*Jackson v. Everett,* 140 F.3d 1149, 1151 (8th Cir. 1998).

    (a).   <u>Hampton's Failure to Protect Claims Against Straughn and Budnik</u>

    Hampton claims that, before the August 14, 2018 attack by Norris, he told
Straughn and Budnik for "over a year" that he was in danger at the Cummins Unit
and had a "bounty on his head." He further claims Straughn and Budnik did not take
his claims seriously, failed to properly investigate his claims, and failed to ensure
that adequate security precautions were taken to protect him.

    Hampton bases all of these claims on his initial vague and generalized
assertions to Straughn and Budnik, in October and November 2017, that five
unnamed members of the Gangster Disciples threatened to stab him and an unnamed
"high-ranking" member "put a bounty on his head" of four grams of K2 to anyone
who could harm him. According to Hampton, this meant he was in danger from
anyone affiliated with the Gangster Disciples or other gangs, as well as anyone who
wanted four grams of K2 – *in other words, virtually every prisoner in the Cummins
Unit*. As a result, Hampton claims it "became completely impossible for [him] to be
reasonably safe being housed anywhere within the Cummins Unit prison." *Doc. 50
at 4; see Doc. 58, Ex. A at 23, & Ex. B at 1*. In making the claim that it was
"impossible" for him to be "reasonably safe … anywhere within the Cummins Unit,"
Hampton overlooks the undisputed fact that, after he first raised his concerns in

September of 2017, he remained safe and sound, in restrictive housing, until many months later when he was the victim of the surprise attack by Norris in the exercise yard.

The undisputed facts show that none of the Defendants could have anticipated Norris's August 14, 2018 attack on Hampton. Before August 14, 2018: (1) Hampton was housed in either restrictive housing or administrative segregation in a single-man cell, or in a two-man cell by himself; (2) soon after he informed prison officials of the September 2017 threat by unnamed gang members, Budnik investigated his allegations and found no evidence of a viable threat to his safety; (3) Hampton refused to tell Straughn, Budnik or any other prison official that he was having problems with, or being threatened by, any particular inmate at the Cummins Unit; (4) Hampton never requested that *anyone* (including the "five Gangster Disciples" who originally threatened him)[10] be placed on his enemy alert list; (5) Straughn and Budnik were not aware of any problems between Hampton and Norris and had no reason to believe that Norris would assault Hampton; and (6) Hampton had never been threatened by Norris (who he had known for several years before the attack), did not believe he had any reason to put Norris on his enemy alert list, and did not have any reason to believe that Norris would attack him.

---

[10]In his deposition, Hampton testified that, at the time of the threat, he knew these five inmates only by "nicknames and stuff of that nature." *Doc. 58, Ex. A at 12, 16-17.*

Viewing these undisputed facts in a light most favorable to Hampton, no reasonable jury could find that, objectively, he was at a "substantial risk of serious" harm from an attack by Norris. *See Blair,* 929 F.3d at 988 (a prison official does not act with deliberate indifference by failing to place an inmate in protective custody "based on his general fear for his safety" and his "speculative and non-specific .. suspicions" about "there being a hit out on him");  *Robinson v. Cavanaugh,* 20 F.3d 892, 895 (8th Cir. 1994); *see also Jones v. Wallace,* 641 F. App'x 665, 666 (8th Cir. 2016) (unpub.).

Additionally, there is nothing about the circumstances of the August 14, 2018 attack which suggests that, subjectively, either Straughn or Budnik acted with deliberate indifference to his safety. There is *simply no evidence* that either Straughn and Budnik knew, based on the generalized safety concerns Hampton voiced almost one year earlier, that he was in danger – imminent or otherwise – of being attacked by Norris on August 14, 2018.

Thus, no reasonable juror could find that Straughn and Budnik were deliberately indifferent to a substantial risk of harm to Hampton. Accordingly, they are entitled to qualified immunity, and Hampton's failure to protect claims against them should be dismissed, with prejudice.

(b).    <u>Hampton's Failure to Protect Claim Against Mickels</u>

Hampton alleges that Mickels: failed to ensure that Norris's pen was locked during her earlier security rounds or when she walked by his pen on the way to Hampton's adjoining pen; violated ADC policy by not having another guard join her in escorting Hampton from his pen; failed to immediately call her supervisor either when she and Norris "exchanged words" or, later, when she saw Hampton being attacked; failed to intervene once Norris began attacking Hampton; and, when Hampton was lying on the ground after the attack, kicked him in the side and called him a racial epithet. *Docs. 60 & 70 ¶¶ 47-48; Doc. 58, Ex. A at 42-45; Doc. 52 ¶¶ 17-21.*

The undisputed facts show that, before August 14, 2018: (1) Mickels was not aware of any problems between Hampton and Norris and had no reason to believe that Norris would assault Hampton; (2) Hampton himself saw no reason to say anything to Mickels about Norris being a threat; (3) Mickels had "past problems" with Norris, which gave her a reason to avoid contact with him; (4) when Norris suddenly burst out of his pen and attacked Hampton, she stepped back because she feared for her safety due to those "past problems"; and (5) *less than four seconds after Norris started hitting Hampton*, he stopped the attack and returned to his pen.

The parties dispute whether Mickels ordered Norris to stop hitting Hampton and whether she could have done more to prevent or cut short the four-second

surprise attack. Given the extremely short duration of the attack, those disputes are *not* material. Furthermore, even if they were and Hampton's version of those facts was taken to be true, it would, *at most,* suggest that Mickels was guilty of gross negligence – not the much higher standard necessary to demonstrate deliberate indifference.

Finally, even if Hampton's allegation that Mickels called him a racial epithet is taken to be true, it would not be sufficient to demonstrate that Mickels was deliberately indifferent to Hampton's safety or violated any other constitutional right.[11] As previously explained, the video does *not* show Mickels kicking Hampton or making any sudden movements toward him with her feet.[12]

Because no reasonable jury could find that Mickels was deliberately indifferent to a substantial risk of harm to Hampton, she is entitled to qualified immunity, and Hampton's failure to protect claims against her should be dismissed, with prejudice.

---

[11]*See Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002) (no constitutional violation due to two incidents of "thoroughly offensive" and "racially derogatory language").

[12]Although the Court must view the facts in a light most favorable to Hampton, it is not obligated to adopt his otherwise unsupported factual statements if they are "blatantly contradicted" by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Reed v. City of St. Charles, Missouri,* 561 F.3d 788, 790-91 (8th Cir. 2009) (holding that plaintiff may not merely point to unsupported self-serving allegations, but must "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor … without resort to 'speculation, conjecture, or fantasy'").

## IV. Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendant Wendy Kelley's Motion for Summary Judgment on the issue of exhaustion (*Doc. 27*) be GRANTED, and Hampton's claims against her be DISMISSED, without prejudice, due to lack of exhaustion.

2.    Hampton's Motion for Summary Judgment on the merits of his claims (*Doc. 49*) be DENIED.

3.    The Motion for Summary Judgment filed by Defendants Jessica Mickels, William Straughn, and Christopher Budnik, on the merits of Hampton's claims, (*Doc. 58)* be GRANTED, and his claims against them be DISMSSED, with prejudice.

4.    The Court CERTIFY, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from any Order adopting this Recommendation would not be taken in good faith.

DATED this 1st day of September, 2020.

_____
UNITED STATES MAGISTRATE JUDGE